ARKANSAS & O. R. CO. v. ST. LOUIS & S. F. R. CO.

(Circuit Court, W. D. Arkansas, Ft. Smith D. August 6, 1900.)

1. RAILROADS—POWER OF EMINENT DOMAIN—ARKANSAS STATUTES.

Under the statutes of Arkansas, as construed by the supreme court of the state, a railroad company which has complied with Sand. & H. Dig. § 6148, and thereby effected its incorporation, becomes vested with the right to exercise the power of eminent domain; and its failure to comply with the subsequent provisions of the statute relating to its organization cannot be invoked as a defense to proceedings under the statute to condemn right of way or an easement to cross the track of another road.

2. SAME.

A railroad company authorized by its articles of incorporation to construct, acquire, purchase, own, equip, and operate a railroad between designated termini may lawfully purchase the road of another company, and make use in its own line of such portion of the track of such road as it sees fit; and the building of a new road connecting with such track does not make necessary a compliance with the requirements of the Arkansas statutes relating to an extension by a railroad company of its road before it can maintain proceedings to condemn a right of way.

3. SAME—CROSSING TRACK OF ANOTHER ROAD.

Under the Arkansas statutes which enjoin upon every railroad company whose railroad is or shall be crossed by any new railroad the duty of uniting with the owner of the new road in forming such crossing, and of granting all necessary facilities for that purpose, and also for the interchange of business at such crossing, where a company desiring to cross with its track the track of another company suggested to the latter a point of crossing, which was approved, such approval estops the older company from objecting, either to the necessity for the crossing or the place, in subsequent condemnation proceedings made necessary by the failure of the two companies to agree upon the terms, and after the new company, in reliance thereon, has purchased right of way and constructed its road nearly to the point agreed on for the crossing.

**4. SAME.**

A railroad company which constructs and operates a line of road in another state subject to the laws of such state, which give other roads the right to cross its tracks, and which require it to afford all proper facilities therefor, has no right to impose upon another company unusual and unnecessary terms as a condition for permitting such a crossing; and its demand that a crossing company shall construct and maintain at its sole expense an interlocking switch, such as it does not itself maintain at any crossing similarly situated on its line, is not a reasonable demand which will be enforced by the courts.

**5. SAME—OBSTRUCTING CROSSING BY ANOTHER COMPANY.**

Where a railroad company, after agreeing with another company as to the point at which the latter should cross its track, and upon the subsequent refusal of the second company to agree to unreasonable conditions, constructed a switch and a spur track on either side of its main track at such point on different grades, and for which it had no need, the real purpose being to prevent the crossing, such tracks will be treated by the court as mere obstructions, which will not be permitted to interfere with the crossing, or to enhance the damages awarded therefor.

This was a proceeding by a railroad company under the statutes of Arkansas to condemn right of way and also an easement to cross the right of way and tracks of another company.

The following are the findings of fact:

On this day came on to be determined the above-entitled cause heretofore submitted, after argument by the respective attorneys of the parties, on the pleadings, exhibits, the depositions of witnesses reduced to writing and filed, maps, plats, profiles, written stipulations, and other proof, and the court, being now fully advised, doth make the following special findings of fact:

That the Arkansas & Oklahoma Railroad Company is a corporation duly organized under the general statutes of the state of Arkansas for the incorporation of railroads, and the St. Louis & San Francisco Railroad Company is also a corporation organized under the laws of the state of Missouri, and at the institution of this suit, and for many years prior thereto, owned and operated a railroad running north and south through the eastern part of Benton county, Arkansas, and through the town of Rogers, in said county, which is a town of about twenty-five hundred inhabitants. That for many years prior to the institution of this suit an independent railroad line, about six miles in length, known as the "Bentonville Railroad," was operated between the towns of Rogers and Bentonville, in the same county, and by an arrangement between the Bentonville Railroad and the defendant company the former road intersected the latter about three-quarters of a mile north of the depot of the defendant company at the town of Rogers, and used the track of the defendant company from the point of intersection to said depot for its terminal facilities. On the 1st day of April the plaintiff company, the Arkansas & Oklahoma Railroad Company, filed its articles of incorporation in the office of the secretary of state of Arkansas, said incorporation having been had under section 6148 of Sandels & Hill's Digest of the state of Arkansas, and in conformity thereto. That said railroad company was incorporated, as stated in its charter, "for the purpose of constructing, acquiring, purchasing, owning, equipping, and operating a railroad from a point at or near the southeast corner of section thirty-one, in township twenty north, range 29 west, in Benton county, Arkansas; thence in a westerly direction across the track of the St. Louis & San Francisco Railroad, and by the way of the town of Bentonville, in said county of Benton, and continuing in a westerly direction across the track of the Kansas City, Pittsburg & Gulf Railroad to the southeast corner of section thirty-five, in township twenty north, range thirty-three west, in said county of Benton," making the entire line of said proposed railroad between twenty-four and twenty-five miles in length. Before this suit was begun, the Bentonville Railroad was absorbed by the Arkansas & Oklahoma Railroad Company, and after its absorption, and up to the commencement of this suit, the Arkansas & Oklahoma Railroad Company, by an arrangement with the defendant

company similar to that which had previously existed between the Bentonville Railroad Company and the defendant company, continued the use of the defendant company's tracks at Rogers for terminal purposes. That the defendant railroad company originally owned, laid off, and platted the town of Rogers, reserving certain properties for railroad purposes, including the right of way which plaintiff company now seeks to cross. That some time afterwards it acquired title to the eighteen-acre tract described in plaintiff's complaint by donation from the people of Rogers, in order to secure a roundhouse and the end of a division at that place. That a roundhouse was constructed on said eighteen-acre tract, and the end of a division also maintained at Rogers until 1886 or 1887, when the end of the division was removed to Chester, and said roundhouse and eighteen-acre tract abandoned for railroad purposes. The roundhouse was left standing, and a single track running thereto was also left. All other tracks were taken up. That since the removal of the end of the division to Chester the roundhouse and the eighteen-acre tract have been abandoned for all railroad purposes. That at the commencement of this suit the walls of the roundhouse were crumbling down, the roof had rotted off, and nothing remained except the dilapidated walls and the single track, which was used by an oil company which had an oil tank upon the premises alongside of the remaining track. That said eighteen-acre tract was not reserved, when the town was laid off, for railroad purposes. That it lies outside of the original plat of the town, and, since the end of the division was removed, has been an abandoned common, used by the defendant company for no railroad purpose whatever. That early in 1898 the plaintiff company entered upon negotiations with the proper officers of the defendant company for new arrangements for terminal facilities, either joint or otherwise, at Rogers, and was then notified that, after the extension of the plaintiff's road west from Bentonville, it must provide its own terminal facilities, and that joint facilities would not thereafter be entertained. That thereupon the plaintiff company began negotiations with the defendant company for the crossing of the defendant road at Rogers. That, as the result of personal interviews and correspondence with the general solicitor and the vice president and general manager of the road, Mr. Yoakum, as well as of correspondence with the latter, the plaintiff company was requested by Mr. Yoakum to designate a point for a crossing, and did so designate the very point at which it now seeks to cross; and the plaintiff company, looking to an amicable arrangement with reference to the point of crossing, made inquiry of the defendant company whether or not there was any other point at which it would prefer that plaintiff company should cross. To this inquiry Mr. Yoakum, the general manager of the defendant company, wrote the following letter:

"St. Louis, January 28, 1899.
"Crossing at Rogers.

"Mr. J. M. Bayless, President, etc., Bentonville, Ark.—Dear Sir: I have gone over, with Mr. Bisbee, the matter of the crossing of the Arkansas & Oklahoma line through our station grounds at Rogers, and we were unable to suggest a point of crossing that would be less objectionable than the one indicated by you. Whenever you are ready, after the contract is signed, Mr. Bisbee will come or send some one to Rogers, and definitely fix the grade and point of crossing. After the agreement is signed, the matter of details can be arranged between Mr. Bisbee and yourself, I think, without any difficulty.
"[Signed]          Yours, truly,               B. F. Yoakum, by C. H. B."

"C. H. B," it is shown in the proof, was the clerk or secretary of Mr. Yoakum. Before this letter was written, the matter had been referred by Mr. Yoakum to Mr. Bisbee, who is a civil engineer in the employment of the St. Louis & San Francisco Railroad Company, and the superintendent of its tracks, bridges, and buildings at Rogers; and Bisbee had recommended the crossing at the point designated in the complaint, upon condition that an interlocking plant was provided for. That the plaintiff company, in February, 1899, notified the defendant company that it would not stand the expense of an interlocking plant, and would force its way through at that point. The disagreement, therefore, with reference to the point of crossing, mainly grew out of the refusal on the part of the plaintiff company to stand the expense of

an interlocking plant. Prior to this a contract had been prepared by the plaintiff company specifying the conditions and requirements which the defendant company required, and the plaintiff company had refused to sign it, and had prepared and tendered another contract, which was not accepted by the defendant company. There was no disagreement between the parties as to the point of crossing. It grew out of the controversy over the interlocking plant and the expense incident to its provision and maintenance; in short, a controversy over the amount of compensation that plaintiff company was required by the defendant company to bear in order to effect the crossing at the point specified. Immediately after receiving the Yoakum letter above set forth, the plaintiff company, acting in good faith upon that letter, bought certain lands lying north and west of the defendant's said eighteen-acre tract on which to construct its roadbed, switches, and wye, preparatory to crossing at the point agreed upon, and proceeded, at great expense, to construct its roadbed and wye thereon, which was constructed down to the point of intersection on the northern boundary of the eighteen-acre tract above referred to. It also proceeded to acquire the right from the town of Rogers to extend its roadbed east and south of the point designated for the crossing of the plaintiff company's line, down Arkansas street in the town of Rogers, to a point opposite the defendant company's depot, and only a very short distance therefrom, and at which depot for many years the plaintiff company had transacted all of its local business at Rogers, using the defendant company's track, as above stated, for three-quarters of a mile north of Rogers for its terminal facilities. After the said lands were purchased and said rights acquired by the plaintiff company, and the defendant company advised of it, and after the right of way on the east side of the defendant company's track was procured from the town of Rogers, the defendant company permitted the plaintiff company to go on and construct its roadbed and wye down to the line of the said eighteen-acre tract, with the manifest purpose of crossing the said eighteen-acre tract and its right of way and track at the point designated, and never, up to the trial, withdrew, or attempted to withdraw, the said letter of Mr. Yoakum, agreeing to the point designated as the proper point for crossing, or even protested that it was not a proper point to cross, or that it would in any way interfere with its business, or detract from the usefulness of its yards; nor did it afterwards claim that any part of the eighteen-acre tract was necessary for trackage or future railroad purposes at the town of Rogers. When the defendant company saw that plaintiff company was constructing its roadbed and line and wye down to the line of the eighteen-acre tract at the point its contemplated line was to enter the eighteen-acre tract, and while the iron was being laid thereon, it at once extended a short spur track on the east side of the main track, south, a sufficient distance to become an obstruction to the crossing of the plaintiff's road at the point designated and agreed upon for a crossing, and constructed a long parallel switch on its right of way on the west side of its main line, the full length of the eighteen-acre tract. At the time the point of crossing was designated and agreed upon, neither of these switches constituted an obstruction at the point of crossing, and they were not put there until the plaintiff company began laying iron on its roadbed and wye just north of the eighteen-acre tract. Both of these switches were roughly and crudely laid down, and below the grade of the main track, and confessedly for obstructive purposes only, and not, as the court finds, because there was any real necessity, present or future, for their use. In truth, Mr. Bisbee, the superintendent of tracks, buildings, and bridges for the defendant company, and who is a civil engineer of many years' standing, and who extended the spur switch on the east side and constructed the long switch on the west side of defendant's line so as to obstruct the point of crossing, on cross-examination was forced to admit that the track of the switch on the west side is about 15 or 18 inches below the main track, and the east side about 4 feet below, and that the natural surface of the ground at that point on both sides is approximately on a grade with the main track,—not entirely so,—and that he constructed the switches in that way "simply to keep 'you folks' [meaning the plaintiff company] from crossing 'us' [meaning the defendant company]"; that that was "protection for ourselves" (meaning the defendant company). On being asked if he did not put the switch in as an obstruction to the con-

templated crossing by the plaintiff company, and for no other reason, he said: "I put those switches in because I had instructions to add what sidings were necessary to the Rogers yard, and use my judgment when and where to put them in. I put them in on a statement made by Mr. Bayless [who was the president of the Arkansas & Oklahoma Railroad Company] in St. Louis, in the general office, giving to understand he was going to force a track over that. I took the matter in hand, and did it as protection to ourselves, as he would not accept our interlocking plant." It is clearly established, therefore, that the refusal of plaintiff company to execute the contract, among other things, providing for an interlocking plant, involving large expense which the plaintiff company was not willing to stand, was the real cause of the disagreement, and brought about a failure of the original agreement as to the terms of crossing. The court finds that on the sixteen hundred miles of railroad operated by the defendant company, on which there are fifty or sixty crossings by other roads, it has only three such interlocking plants as was required of the plaintiff company,—one at Coburg, just outside of Kansas City, where the defendant company crosses two other roads; one at Fair Lawn, in the immediate vicinity of St. Louis; and one about half a mile from Oklahoma City, which has some six or eight thousand people; that it has no interlocking plants at such places as Neosho, Mo., Nichols Junction, and Springfield, Mo., Ft. Smith, Ark., Vinita and Claremore, Ind. T., some of which are towns from three to five times as large as the town of Rogers; that they have several contracts for putting in interlocking plants at some of the points just named, and perhaps at other places, and, when inquired of as to the reason why interlocking plants had not been put in at those places, the witness Bisbee stated that that was a question for the transportation department to say when they needed interlocking plants, and not him. The court finds as a matter of fact that there is no real necessity for an interlocking plant at Rogers; that there is no unusual or extraordinary danger at Rogers in establishing an ordinary grade crossing there which is not incident to crossings at other places much larger in size, and at which there are no interlocking plants; that the effort to show the necessity there for an interlocking plant, and the necessity for additional trackage on the eighteen-acre tract, is a mere subterfuge, having no foundation in fact, and is a part of the obstructive tactics employed by the defendant company to secure a contract for an interlocking plant, at their pleasure, at Rogers, at a place where one is now not required, and not likely ever to be required. The testimony fails to convince the court that the crossing of the plaintiff's road at the point designated will destroy or materially affect the value of its yard at Rogers, or impair its usefulness, or materially interfere with its business there beyond that which is incident to the crossing of a road at any point. The court further finds that before the institution of this suit the plaintiff company had surveyed and located its line of road across the eighteen-acre tract and across the line of the defendant company at the point designated in the complaint, and had made a map and profile of the route intended to be adopted by said company, which was duly certified and filed in the office of the clerk of Benton county, Ark., as required, and in conformity to section 2765 of Sandels & Hill's Digest of the Statutes of Arkansas, and that the line surveyed and located runs across the eighteen-acre tract and the right of way and track of the defendant company as the same is described in the complaint. The court further finds that the eastern terminus of plaintiff's line, as designated on the map and profile of the plaintiff's road, is in the neighborhood of one mile southwest from the point designated in the charter, and is on the east side of the defendant company's road, as designated in its charter; that the proof does not show that the plaintiff company has ever made any other survey, map, or profile of its road, or made any changes whatever in this one since it was filed; that the surveyed line is a substantial compliance with the plaintiff's charter. The court further finds that the yards of the defendant company are about one-half mile from the point designated for the crossing of defendant company's road, and the depot of defendant company is a little less than one-half mile from the proposed crossing; that plaintiff's road is now constructed and operated west from Bentonville about twenty miles, and graded several miles further west in the direction of Southwest City, Missouri. The court further finds that the short spur

switch on the east side of defendant company's main line, and which was extended so as to constitute an obstruction at the point of crossing, is not a switch in any general use; one of the witnesses who lived near by and passed the switch every day testifying that he never saw a car on that switch, and never had seen the switch open. The court further finds that the public convenience and necessity require that the road of the plaintiff company should cross the defendant's line of road at Rogers, and that the point designated in the plaintiff's complaint is a proper place for the crossing; that the necessity that the plaintiff's line should be run to the point on Arkansas street opposite and near the depot of the defendant company is a public necessity was recognized by the defendant company by its joint arrangement for the use of its own track for many years to its said depot near that point, as well as shown by other testimony, and especially by the Yoakum letter above quoted.

On the above findings of fact the court makes the following declarations of law:

1. That the Arkansas & Oklahoma Railroad Company is a corporation having power to exercise the right of eminent domain, and has in all things conformed to the statutes of the state of Arkansas giving it the right to the exercise thereof, and that this proceeding to condemn is for a necessary and public purpose.

2. That the defendant company is estopped from being heard to say that the point designated for the crossing by the plaintiff company is not a suitable and proper point for the crossing, or that there is no necessity therefor.

3. That, if it is not so estopped, the court declares that the point designated is a proper place for the crossing, and that there is a public necessity that the plaintiff company should cross the defendant's line so as to reach the point in Arkansas street opposite the depot of the defendant company in the town of Rogers, and that such necessity is shown by evidence and recognized by the defendant by the arrangement entered into by it with the Bentonville Railroad for the joint use of its tracks in order that the Bentonville Railroad, and afterwards the plaintiff company, might reach the depot of the defendant company.

4. That the eighteen-acre tract of land is in no proper or rightful sense a part of the yards of the defendant company, but is property now, and which has been for years past, held by the defendant railroad company for no public purpose connected with its railroad business, and is, therefore, subject to condemnation for public purposes like the property of any other corporation or individual.

5. That the plaintiff company is entitled to the right of way as described in the complaint, through the eighteen-acre tract, and of one hundred feet in width, and that the same should be condemned for that purpose, and that the value thereof, and the damage to the remainder of the tract, is the sum of $550; that the plaintiff company should not be allowed to condemn for its sole and separate use any portion of the right of way or track of the defendant company, but is entitled to an easement over the same for the crossing at the point designated in the complaint for a single track of standard-gauge railway; and that the plaintiff company should pay all of the expenses necessary to the construction of an ordinary grade crossing across the defendant's main line at the point designated in the complaint, including the necessary grading, iron, frogs, switches, and other appurtenances for an ordinary crossing, as well as the labor and all material used in constructing the same. In short, that the crossing of the defendant's line should be made wholly at the expense of the plaintiff company, and that the defendant company should furnish such facilities therefor as the statute requires. The court further declares that the switches on the east and west sides of said road at said point of crossing should be treated as mere obstructions, which the court finds they are, and are not switches constructed there for railroad purposes because necessary or desirable for defendant's business. The court further declares that the plaintiff company should have the right to cross what is designated in the complaint as the "mill switch" at a point in the center of Arkansas street, and that the plaintiff company should furnish the material, including the grading, iron, frogs, switches, and other necessary appurtenances for an ordinary grade crossing, as well as all other labor and material in con-

structing the same. In short, that the crossing of defendant's main line and mill switch should be made wholly at the expense of the plaintiff, and that the defendant company should furnish such facilities therefor as the statute requires. The court further finds the damages of the defendant company for such easement over its said right of way, track, and mill switch, as well as the damages which the defendant company sustains by reason of the crossing thereof, to be the sum of $450; making the total damage to be paid by the plaintiff the sum of $1,000.

It is therefore considered, ordered, and adjudged that a right of way one hundred feet in width be, and the same is hereby, adjudged and condemned in favor of the plaintiff company, the Arkansas & Oklahoma Railroad Company, and against the St. Louis & San Francisco Railroad Company, across the following described real estate, situate in the county of Benton, and state of Arkansas, to wit: "A part of the northwest quarter of the northwest quarter of section 7, township 19 north, range 29 west, and more particularly described as follows, that is to say: Beginning at the northwest corner of said northwest quarter of said section 7, township 19 north, range 29 west, and running east with the line of said section 7 535 feet, and to the western boundary line of the right of way of the St. Louis & San Francisco Railroad; then in a southwesterly direction along the west boundary line of said right of way, and 50 feet from and parallel with the center of the railroad track of the said St. Louis & San Francisco Railroad, 2,016 feet to the north boundary line of Maple street, in the town of Rogers, Arkansas: then west along with said north boundary line of Maple street 86 feet, more or less, to the northeast corner of Maple and Douglas streets, Sikes' addition to said town of Rogers; thence north along the east boundary line of said Douglas street a distance of 380 feet to the northeast corner of Douglas and Cedar streets, in said town of Rogers; thence in a westerly direction along the north boundary line of said Cedar street to the point of intersection of the west boundary line of said section 7: thence north along said western line of said section 7 to the place of beginning,—containing eighteen acres, more or less." And that said right of way hereinbefore referred to is described as follows, that is to say: That the center of said right of way enters upon the said eighteen acres of land hereinbefore described at a point 31 feet east of the northwest corner of said section 7, township 19 north, of range 29 west; then running in a southeasterly direction to a point of intersection of the western boundary line of the defendant's right of way 1,060 feet south of a portion of the north boundary line of the northwest quarter of the northwest quarter of said section 7. The said right of way so condemned shall embrace 50 feet on either side of said above-described line across said entire tract of eighteen acres of land, the said right of way being more accurately described in plaintiff's complaint, to which reference is made, but not to interfere with the roundhouse or switch thereto. It is further considered, ordered, and adjudged that the plaintiff company is entitled to an easement for a standard-gauge railroad track across the entire right of way of the defendant railroad company at a point fixed by continuing the line heretofore described as the center of the right of way across said eighteen-acre tract in a southeasterly direction across the defendant's right of way, and across the defendant's railroad track, at a point thereon 1,159 feet south of the point where said track is crossed by the north boundary line of the said northwest quarter of the northwest quarter of said section 7; then continuing in a southeasterly direction over and across the defendant's right of way on the east side of its track a distance of 169 feet to a point of intersection of the eastern boundary of the street known and designated as "Arkansas Street," in said town of Rogers, which street runs south parallel and contiguous with defendant's right of way, said easement across said right of way and railroad track of the defendant company being of sufficient width only to construct and grade a track of a standard-gauge railway, and not to exceed at any point 20 feet. It is further considered, ordered, and adjudged that an easement be, and the same is hereby, condemned in favor of the plaintiff company across what is known and described in the complaint as the "mill switch," at a point in the center of said Arkansas street, and in the middle of said street, where said switch crosses the same, and that such easement be of such width only as is necessary for

103 F.—48

the construction of the track and bed of said plaintiff railway company. It is further considered, ordered, and adjudged that all the expense of said crossings, including the necessary grading, iron, frogs, switches, and other appurtenances for an ordinary grade crossing, as well as the labor and all material used in constructing the same, be supplied and furnished by the plaintiff company, and that the plaintiff company pay into the treasury of this court, for the use and benefit of the defendant company, or to the defendant company, or its attorney of record, by way of compensation for damages sustained by the defendant company, as stated in the special findings of fact hereinbefore recited, the sum of $1,000, for the sole use and behoof of the defendant company. It is further considered, ordered, and adjudged that each of the parties to this proceeding pay its own costs incurred herein. It is further considered, ordered, and adjudged that, upon the plaintiff company complying with the terms of this judgment, the proper lands and easements hereinbefore described be, and the same are hereby, condemned to the use of the plaintiff as hereinbefore more particularly stated, and that the plaintiff company have the right to enter upon and construct its line of railway over and across said property and defendant's right of way and railroad track and switches as the same are hereinbefore described, and, upon the failure of the plaintiff company to pay the amount hereinbefore stated within thirty days next after the rendition of this judgment, that all of its rights herein described be, and the same are hereby, forfeited, and this judgment held for naught.

James A. Rice, for plaintiff.

B. R. Davidson, for defendant.

ROGERS, District Judge. This is a civil proceeding under the statutes of Arkansas, and demands relief under two distinct statutes:

First. The condemnation of the right of way across the 18-acre tract of land described in the complaint; and the proceeding for that purpose was instituted under the following sections of Sandels & Hill's Digest of the Statutes of Arkansas:

"Sec. 2770. Any railroad, telegraph or telephone company, organized under the laws of this state, after having surveyed and located its lines of railroad, telegraph or telephone, shall in all cases where such companies fail to obtain by agreement with the owner of the property through which said lines of railroad, telegraph or telephone may be located, the right of way over the same, apply to the circuit court of the county in which said property is situated, by petition, to have the damages for such right of way assessed, giving the owner of such property at least ten days' notice in writing of the time and place where such petition will be heard."

"Sec. 2772. If the owner or owners of such property be non-residents of the state, infants or persons of unsound mind, such notice shall be given by publication in any newspaper in said county which is authorized by law to publish legal notices, which notice shall be published for the same length of time as may be required in other civil cases. If there be no such newspaper published in the county, then said publication shall be made in some such newspaper designated by the circuit clerk, and one written or printed notice thereof posted on the door of the court house of such county."

"Sec. 2774. Such petition shall, nearly as may be, describe the lands over which said road is located, and for which damages are asked to be assessed, whether improved or unimproved, and be sworn to."

"Sec. 2776. The amount of damages to be paid the owner of such lands for the right of way for the use of such company shall be determined and assessed irrespective of any benefit such owner may receive from any improvement proposed by such company.

"Sec. 2777. In all cases where damages for the right of way for the use of any railroad company have been assessed in the manner hereinbefore provided, it shall be the duty of such railroad company to deposit with the court or pay to the owners the amount so assessed, and pay such costs as may, in

the discretion of the court, be adjudged against it, within thirty days after such assessment; whereupon it shall and may be lawful for such railroad company to enter upon, use and have the right of way over such lands forever."

"Sec. 2780. In all cases where such company shall not pay or deposit the amount of damages assessed as aforesaid within thirty days after such assessment, they shall forfeit all rights in the premises.

"Sec. 2781. The words 'right of way' as used in this act, shall be construed to mean and include all grounds necessary for side-tracks, turn-outs, depots, work-shops, water stations and other necessary buildings."

Second. The condemnation of an easement, merely, across the right of way and the tracks of the defendant company; and for that purpose the proceeding was instituted under the following sections of said digest:

"Sec. 6345. Every railroad corporation created and organized under the laws of this state, or created and organized under the laws of any other state or the United States, and operating a railroad in this state, shall have the power to cross, intersect, join or unite its railroad with any other railroad now constructed or that may hereafter be constructed, at any point on its route and upon the grounds and right of way of such other railroad company, with the necessary turnouts, sidings, and switches and other conveniences in furtherance of the object of its construction. And every railroad company whose railroad is or shall be crossed, joined, or intersected by any new railroad shall unite with the owners and corporation of such new railroad in forming such crossing, intersection and connection, and shall grant to such railroads so crossing, intersecting or uniting all the necessary facilities for that purpose as aforesaid.

"Sec. 6346. If the two corporations can not agree upon the amount of compensation to be made for the purposes set forth in the foregoing section, or the points or manner of such crossing, junction or intersections, the same shall be ascertained and determined by a court of competent jurisdiction in the same manner as provided for the ascertainment of damages for right of way for railroads.

"Sec. 6347. Every railroad company operating a railroad in this state shall cause all freight and passenger trains running on their roads to stop at all points on their roads where another railroad crosses, joins, unites or intersects and take and receive on their trains all passengers, freights and mail which such railroad so crossing, joining or intersecting has for shipment at such point, and shall carry the same and shall also discharge all passengers, freights and mail consigned to said point of crossing, intersection or junction of such railroad, and which is to be transported, carried and conveyed on said railroad, and no railroad company shall in any wise discriminate against passengers or freight transported or conveyed by any intersecting railroad company.

"Sec. 6348. Any railroad company violating any of the provisions of the preceding sections shall forfeit and pay to the company injured thereby double the amount of damages which such injured company may have sustained, to be recovered in any court of competent jurisdiction."

There is no reported case of the supreme court of this state, nor in the United States courts, so far as has been discovered, settling the practice or the nature and character of the judgment to be rendered under the last-named sections of the statute providing for the crossing or intersecting of one railroad by another, and the statute itself is so crude and meager in its provisions as to what the court is to do that I have found no little difficulty in framing any judgment adequate to the situation without trenching on legislative ground. It is to be hoped that this case may be taken to a higher court, where some authoritative decision can be rendered for future guidance of the inferior courts, and that the attention of the leg-

islature of the state may be drawn to the crude, incongruous mass of patchwork legislation in regard to railroads in this state which now almost defeats intelligent judicial interpretation and enforcement in many particulars.

It was urged with much persistence that the plaintiff corporation, at the commencement of this suit, had not been organized so as to authorize it to exercise the right of eminent domain. It was not, however, insisted that it had not complied strictly with section 6148 of Sandels & Hill's Digest. It was insisted that it had not complied with section 6149 of Sandels & Hill's Digest, and that a compliance with that section of the statute was a condition precedent to its right to exercise the power of eminent domain. To this contention I cannot agree. The question has been settled by the supreme court of Arkansas in the case of Brown v. Railway Co. (Ark.) 56 S. W. 862. Upon the authority of that case, which is binding upon this court, I hold that, upon compliance by plaintiff with the section 6148 of Sandels & Hill's Digest, the plaintiff became an incorporation vested with the right to exercise the power of eminent domain, and that its failure to comply with the subsequent provisions of the statute, if such were true, relating to its organization, are questions which the defendant cannot raise under the statutes and decisions in this state in a proceeding like this, but that such questions must be remitted to the state under whose laws the plaintiff corporation was organized.

It was also urged that the plaintiff corporation had not complied with the act entitled "An act to amend the railroad laws of this state," found on page 365 of the bound acts of Arkansas, approved May 8, 1899. This act was not in force when the plaintiff corporation was organized or this suit was brought. It has no application to the case, and does not affect the organization of the plaintiff corporation, or impose any duty upon it as a condition precedent to the right to maintain this suit.

It was insisted that the plaintiff corporation, in seeking to build into the town of Rogers, was extending its road. Such is not the case. If the work now sought to be done was being prosecuted by the Bentonville Railroad, which plaintiff corporation absorbed, the contention might be pressed with much force that it could only be done after a compliance with section 6176 of Sandels & Hill's Digest, as amended by the act of May 8, 1899. But such is not the case. The plaintiff corporation, when organized, was not, under its charter, compelled to buy the Bentonville Railroad, or, after buying it, to continue the use of its whole line. It took out an original charter of its own, and defined its termini. It had a right to do this, and, if it chose, it had the right to absorb by purchase the Bentonville Railroad. But such a purchase did not compel it to adopt its whole line. It may be that, under the provisions of the constitution of this state, the plaintiff would not have had the right to have paralleled the Bentonville road from Rogers to Bentonville with its road; but whether it did or not was not a question for the defendant corporation, but was a question for the state. Surely, if it had the right to buy the Bentonville Railroad, it might use such portions of it in operating its own line as it saw fit,

and I know of no authority or power anywhere to prevent it from abandoning other portions so long as it operated its line of road from Rogers to Bentonville. At all events, as stated, these were not questions the defendant could raise, but questions for the state, whose creatures all domestic corporations are. The construction of the road into Rogers by plaintiff was not, therefore, an extension of its line, nor was it a branch line. It was merely the construction of its line as originally chartered, which charter was in no wise affected by the act of May 8, 1899. And the mere fact that in constructing its road from Rogers to Bentonville it used the greater portion of the old line of the Bentonville Railroad does not alter the fact that it was simply constructing, under its original charter, its own road.

Several other questions of a purely technical character were raised by the defendant corporation, but I think they are wholly without merit, or are determined either by the special findings of fact or the principles decided in Brown v. Railway Co., supra.

Much evidence of an expert character was taken in this case in the effort to show that no public necessity had been shown for building this road down Arkansas street to a point opposite the defendant's depot in the town of Rogers, and hence no right to cross its 18-acre tract and its main line and switches on either side thereof; second, that, if such necessity existed, other points of crossing and other routes into said town were equally accessible, less injurious and dangerous to the public and the defendant's employés and business interests, and that no engineering obstacles or difficulties interposed to prevent the adoption of such other routes, and that it was only a matter of economy that the route sought was adopted; third, that the right of way and 18-acre tract were already condemned for railroad purposes, and should not, in the absence of imperative necessity, such as would defeat the purpose of plaintiff's charter rights, be condemned for other like railroad purposes by another corporation; fourth, that great loss and injury would be sustained by the impairment of the usefulness of defendant's yards if the crossing sought was allowed; fifth, that the grade of defendant's road at that point was unfavorable to a crossing; and other obstacles, more or less speculative and imaginary, were pressed with apparent zeal and pertinacity on the attention of the court. The St. Louis & San Francisco Railroad Company, although a foreign corporation, can only do business in this state by conforming to its laws. It is here by the grace of the state, and not by any right conferred upon it by any other sovereignty. Being here by the grace of the state, it is entitled to the full protection of its laws; and, on the other hand, it should cheerfully conform to any laws regulating it enacted for the general welfare of its people and the interests of the state.

Section 1, art. 17, of the constitution of Arkansas of 1874, provides:

"All railroads, canals and turnpikes shall be public highways, and all railroads and canal companies shall be common carriers. Any association or corporation organized for the purpose shall have the right to construct and operate a railroad between any points within this state, and to connect at the state line with railroads of other states. Every railroad company shall have the right with its road to intersect, connect with or cross any other road, and shall receive and transport each the other's passengers, tonnage and cars, loaded or empty, without delay or discrimination."

Section 9 of the same article provides:

"The exercise of the right of eminent domain shall never be abridged or so constructed as to prevent the general assembly from taking the property and franchises of incorporated companies and subjecting them to public use the same as the property of individuals."

Section 6175 of Sandels & Hill's Digest confers extensive powers upon corporations, and also places upon them liabilities and restrictions, and, among other things, provides that they shall have power "to construct their road upon or across any stream of water, water course, road, highway, railroad or canal, which the route of the road shall intersect." And by the sixth paragraph of the same section it is provided that they "shall have power to purchase lands or take them, may change the line of its road whenever a majority of the directors shall determine, as is hereinafter provided, but no such change shall vary the route of such road to exceed five miles laterally." It will be seen, by reading sections 1 and 9 of the constitution of this state, above quoted, that every railroad corporation doing business in this state, and holding property therein, holds the same subject to the state's right of eminent domain, and to have its property and franchises subjected to public use, the same as the property of individuals. It will also be seen that all railroads have the right to construct and operate their lines between any points within this state, and the further right to intersect, connect with, and cross any other road, and are compelled to receive and transport each the other's passengers, tonnage, and cars, loaded or empty, without delay or discrimination. And the legislature of this state, by the act of March 20, 1883, embraced in sections 6345, 6346, and 6347, above quoted, in pursuance of the foregoing provisions of the constitution, gave every railroad corporation created and organized under the laws of this state, or the laws of any other state, and operating a railroad in this state, the power to cross, intersect, join, or unite its railroad with any other railroad now constructed, or that may hereafter be constructed at any point on its route, and upon the grounds or right of way of such other railroad company, with the necessary turnouts, sidings, switches, and other conveniences in furtherance of the object of its construction; and it enjoins upon every railroad company whose railroad is or shall be crossed, joined, or intersected by any new railroad to unite with the owners and corporation of such new railroad in forming such crossing, intersection, and connection, and to grant to such railroads so crossing, intersecting, or connecting all the necessary facilities for that purpose. It also provides that, if the two corporations cannot agree upon the amount of compensation to be paid for the purposes hereinbefore stated, or cannot agree as to the points or manner of such crossing, junction, or intersection, the same shall be ascertained and determined by a court of competent jurisdiction, in the same manner as provided for the ascertainment of damages for right of way for railroads. It is also provided in section 6347 that every railroad company operating a railroad in this state shall cause all freight and passenger trains running on their roads to stop at all points on their roads where another railroad crosses, joins, unites, or intersects, and take and receive on their trains all passengers, freights, etc., and for failure to do any of these things such railroad company

forfeits double the amount of damages which the injured company may sustain, to be recovered in any court of competent jurisdiction. It was the duty, therefore, of the St. Louis & San Francisco Railroad Company, upon application of the plaintiff corporation, to unite with it in effecting the crossing of its road; and what is meant by the word "unite" is "to concur, or act in concert with" the plaintiff corporation in accomplishing that end. And it was its duty to do this in good faith, and to offer all necessary facilities with the view of accomplishing that purpose.

In the premises now under consideration the defendant company, in the opinion of the court, while protesting its desire not to be captious, but amicably disposed to unite in effecting the crossing of its road by the plaintiff company, has wholly failed to obey either the law or the spirit of the constitution and laws of this state regulating the crossing of railways. By permitting the Bentonville Railroad, while it was in existence, and the plaintiff company after it absorbed the Bentonville road, the use of its track for three-quarters of a mile in order to reach its depot, it recognized and admitted the public necessity for the plaintiff company, after such joint facilities were denied, to extend its line as near to the defendant's depot as possible, and manifestly for the mutual convenience of the traffic and travel of both roads, for both roads are compelled by the statute of the state (which it is to be presumed they both wish to obey) to stop all trains at all intersections or crossings, and to receive each the other's passengers, freight, and cars. If this could be done at the defendant's depot, and to the satisfaction of both roads and the public, rather than to have two depots and two stops within three-quarters of a mile of each other, manifestly it was for the mutual convenience of both roads, and more satisfactory to the public, to do so. And so, when the defendant company, after submitting the request to cross at the point designated to its engineer, and having received his report, then wrote plaintiff to the effect that the point suggested by plaintiff for crossing was as little objectionable as any other point it could name, it not only conceded the necessity for the crossing, but it also waived all objections to the point suggested. The effort, therefore, to show that there was no necessity for a crossing, and that the point suggested was ruinous to its business interests and to its yard, and that the grade of its road was such as to make it expensive and dangerous to have the crossing there, is, of necessity, futile. All these objections are merely subterfuges and afterthoughts,—obstacles intended to embarrass a crossing already conceded to be proper and necessary,—and do not address themselves either to the judgment or charitable consideration of the court. Manifestly, the real reason the defendant company opposes the crossing is its desire for a contract enabling it to introduce an interlocking plant at the crossing whenever, in its judgment, it becomes necessary, without expense to itself. But should such alleged obstacles now have consideration, under the circumstances of this case? After the Yoakum letter of January 28, 1899, set out in the special findings of fact, was written, the plaintiff company, in good faith, and relying on that letter, purchased, at considerable expense, lands

lying north and west of the 18-acre tract, and graded its main line, wye, and switches thereon down to the north line of the 18-acre tract at the point designated for entering upon the same, and began laying its iron thereon, when for the first time it then discovered that defendant was laying a switch on its right of way along the east side of the 18-acre tract, and west of its main line, and also extending another switch, not in any general use or demand, on the east side of its main line, so as to obstruct, by both said switches, the point of crossing which had been agreed upon. If the point of crossing agreed upon should now be denied plaintiff, these lands and the money expended on the roadbed, switches, and wye is a dead loss to the plaintiff, not to say anything of the annoyance and delay in procuring another crossing, and the expense of procuring grounds and right of way for approaches thereto. In the opinion of the court the defendant company should be estopped from being heard to say that the crossing was not necessary, or that the point suggested was not a proper one, or that the 18-acre tract was not subject to condemnation, or that the crossing of the defendant's line at the point designated would materially injure its business or its yards. But, if it was not estopped, the court is of opinion, from the testimony, that such is the case, and so holds. This conclusion eliminates from consideration the question as to whether there are other eligible routes over which the plaintiff company could reach the same point by the expenditure of a sufficient sum of money. This, no doubt, is true. It might cross at the old intersection of the Bentonville road, and condemn its way through the residence property of citizens on the east side of the defendant's main line down to the north end of Arkansas street, and thence down that street to a point opposite the defendant's depot. The distance, however, would be greater, and the expense much larger. Moreover, the persons through whose lands the road would then run have the same right to object and protest against the condemnation of their homes as the defendant company has as to its 18-acre tract, and to urge, with greater reason and justice, that the route which is now sought is more economical and direct, and over land wholly unoccupied for any purpose, and therefore that their homes and property should not be destroyed.

But it may be said that the defendant did not agree to the point designated for a crossing except upon condition that an interlocking plant be put in. Where does the defendant acquire the right to demand an interlocking plant at the expense of plaintiff? Can it dictate its own terms, without regard to the rights of the plaintiff? Why should it have the exclusive right to do this, when it accepted its own right to do business in this state upon condition that its road might be crossed by other roads at such points as they might see fit? Of course, the statute giving the right to the plaintiff company to cross the defendant's road would not be so construed by the court as to permit a crossing at any point, without regard to the rights of the defendant. The defendant railroad company accepted its right in this state subject to its laws, and also its powers (within constitutional limitations) of changing its laws. One of the conditions imposed by law when it acquired its rights was that any other

road should cross it, and that it should offer all proper facilities therefor. In the opinion of the court, neither road had any other or greater right than the other as to the manner of crossing, or the appliances to be employed. Both should be reasonable, having regard for the common safety and rights of each other and the rights of the public; and, in the event they could not agree as to the amount of compensation and point of crossing, such questions must be remitted to the courts for determination. In the opinion of the court, the demand of the defendant company for an interlocking plant at Rogers was unjust, unreasonable, and oppressive, and should not be enforced. In the face of the admitted fact as to the practice of this large, well-regulated, and ably-conducted railroad system that nowhere on its 1,600 miles of railroad has it a single interlocking plant at any place similarly situated and of the size of Rogers (which is an interior town in the mountain regions of Arkansas), the expert testimony of the engineers as to the necessity of such a plant at Rogers is utterly impotent of any probative force. Such testimony challenges the humane and intelligent management of its large properties, and imputes to it neglect of duty to the public in not having constructed these plants at the numerous crossings on its own lines passing through large towns confessedly with much better prospects of growth and larger possibilities for the future. I am not willing to admit that the defendant corporation is open to such neglect of duty, nor that, if sued for an injury resulting at any crossing where no interlocking plant exists, alleging that the injury resulted from the absence of such plant which it was its duty to have provided, the defendant company would be willing to concede its failure to have such plant to be negligence, nor that the courts would hold, as a matter of law, that it was negligence; nor do I doubt, from the testimony in this case, that defendant company would be able to show that such plants were not usual, customary, or necessary at places such as Rogers, Ark. The demand made, therefore, of plaintiff company for a contract providing for an interlocking plant, was a demand the defendant company had no right to make under present conditions; nor can mere speculations as to the future growth of Rogers be made the basis for compensation for probable injuries resulting from the absence of an interlocking plant, or the basis for damages so purely speculative as the testimony develops in this case. It may be that the little mountain resort, now quietly and modestly nestling among the apple orchards of that prosperous and lovely region beyond the Ozarks, and chiefly, as well as justly, celebrated for its good water, pure air, red apples, and happy, contented, and rustic population, favored as it is by the somewhat familiar and euphonious name of "Rogers," will, in a few years, be metamorphosed into a great commercial metropolis, and that its unpretentious and rural people will give place to the surging, struggling masses of a busy mart of trade and commerce; but these optimistic speculations as to the future are altogether too dreamy and ethereal to become the basis of damages for land (though most favorably located in the event the prophetic destiny of Rogers shall be realized), now simply an abandoned common, and at most not worth

more than $100 per acre. The courts, under the most favorable circumstances, do not deal with things so fanciful and visionary, and in this dry, hot, sultry weather, only things real, tangible, and practical command a patient consideration. Moreover, a glance at the blue-print map introduced by the defendant, and which was explained to the court, shows the route selected to be the only practicable route; since, if the road had been run on the west side of defendant's main line to a point opposite the defendant's depot, it would have been compelled to have condemned for right of way not only a part of the defendant's reservation for railway purposes, on which stand various railway improvements, in order to reach the point, but to condemn a part of said reservation for depot purposes, or else condemn a right of way along Douglas street, the principal business street of the town of Rogers, for nearly half a mile, and also locate its depot in that street in the very heart of the town. No court would entertain that proposition for a moment, unless there was an imperative necessity therefor. It will be observed, from an examination of the map, that on the east side of the line of the defendant company, and between its right of way and Arkansas street, there is a strip of property now occupied by various industries; and immediately opposite the depot, upon this strip, a vacant lot. It does not appear from the proof where the plaintiff company expects to build its depots, but it will be assumed, in the absence of proof, that it would not attempt to obtain, by condemnation proceedings, a line of road to the point mentioned in the complaint without having first examined into at least the question of procuring sufficient property upon which to establish its depots, and especially since the statutes of the state designate the character and kind of depots which every railroad company must maintain. Sand. & H. Dig. § 6219, as amended by the act of March 31, 1899 (Bound Acts, p. 152).

It is contended that the 18-acre tract constituted a part of the defendant's switch yards; that said tract and the right of way had been dedicated for railway purposes, and should not be condemned by plaintiff for a like purpose. This 18-acre tract, on which was constructed a roundhouse and some tracts leading thereto, had been used for a few years for that purpose, but as far back as 1886 or 1887 it was abandoned by the defendant company for all railway purposes. A single track, however, was left, leading to the roundhouse; and an oil company, for its convenience, built an oil tank and office by the track. The roundhouse became dilapidated, its walls crumbled down, roof rotted off or burned by tramps, who made it a rendezvous, and the whole tract stood for years an abandoned common, used for no other purpose than that above stated. It is at its nearest point nearly half a mile from the depot of the defendant company, and the switch yards of defendant are principally beyond the depot, and on the opposite side and south of town. When plaintiff company began negotiations early in 1898 for new arrangements for terminal facilities at Rogers, and until after the Yoakum letter dated January 28, 1899, this 18-acre tract remained in the condition I have described, used for no railroad purposes whatever, and there were no switches on either side of the defendant line obstructing the

crossing at the point designated in the complaint, and no apparent necessity for additional trackage seems to have urgently pressed itself upon the management of the defendant company. This is made to conclusively appear by the Yoakum letter bearing date January 28, 1899; but after the interview in St. Louis between the president of the plaintiff company and Mr. Yoakum, the vice president and general manager of the defendant company (which interview must have occurred in the month of February, 1899, and in which the former refused to stand the expense of an interlocking plant, and declared his purpose to force his way through the track, and to cross the defendant's line at the point designated in the complaint), ostensibly there sprung immediately into existence an urgent necessity for more trackage at Rogers. It does not appear that any appreciable increase in business had occurred between January 28, 1899, the date of the Yoakum letter, and March, 1899, a space of about 30 days, when this new trackage was put in; but, nevertheless, the necessity for the additional trackage was ostensibly necessary and urgently pressing,—so pressing that Mr. Bisbee, the defendant company's engineer, was authorized to put it in, using his discretion when and where it should go. Mr. Bisbee tries to make it appear that he had received instructions to put in more trackage at Rogers the previous year; but, if he did, the necessity for it does not appear to have occurred to Mr. Yoakum in his letter of January 28, 1899, and that it was necessary to put it in so as to obstruct the crossing at the point designated in the complaint. But Mr. Bisbee proceeded at once to put in the trackage, and he put it in, not on the 18-acre tract, but on the defendant's right of way, alongside thereof, and the full length of the track, and put it in in such a way as to make it the greatest possible obstruction to plaintiff's crossing at the point previously designated by plaintiff and agreed to by defendant. He also extended a spur switch on the east side of defendant's track about 136 feet, so as to make it also an obstruction to the plaintiff crossing at the point designated and agreed upon. This 136 feet must have given the defendant company great relief, for one of the witnesses who lives north of that switch, and who passes it every day in going to and from town, says that he has never seen the switch open nor a car on the track. Confessedly, these were obstructions put there in bad faith, and for no other purpose than to force defendant to terms, which, as we have seen, were unjustly and illegally demanded.

Plaintiff had a right, under the constitution and laws of Arkansas, to cross defendant's line, and it was defendant's duty to assist in making the crossing, and afford all necessary facilities. Instead of doing so, it set to work, in bad faith, to obstruct and defeat the plaintiff in doing what the law gave it the right to do, and in so doing it disobeyed the statutes of the state, to the detriment and injury of the plaintiff company, and now it seeks to defeat plaintiff in making its crossing at all, and, in the event it fails in that, to secure large damages for injury to the defendant's yards, claiming that the 18-acre tract is a part of its yards, when in truth it is not now, and has not been for 10 or 12 years; and also to secure damages because of crossing its two switches, put in as mere obstructions, and in or-

der to deter plaintiff from crossing, and, failing in that, to get additional damages therefor. Conduct like this does not commend itself either to the judgment or the conscience of the court. No one should be allowed to gain by his own wrong. The court is of opinion that the plaintiff company has a right to cross the road of the defendant at the point designated in the complaint, without reference to its switches, which were placed there as mere obstructions; and that, if it shall become necessary, in future, for the defendant company to use any portion of the remainder of its 18-acre tract for switches, it will be time enough then to determine how and on what terms the crossing of plaintiff company's prospective line of road should be made. The court is of opinion that a strip of 100 feet in width should be condemned across the 18-acre tract to the use of the plaintiff company as a right of way for its railroad, and that the plaintiff company should pay for said land, and for the damage to the remainder of the track the sum of $550; and that an easement should be condemned across the right of way and track and switches of the defendant company, as described in the complaint, to the use of the plaintiff, of a width sufficient for one standard-gauge railway track; and that for said easement and damages which the defendant sustains by reason thereof the plaintiff should pay the sum of $450, making damages in the aggregate of $1,000. The court is of the opinion, also, that the labor, material, and all appliances necessary to be furnished for crossing at grade the defendant company's railway and mill switch should be furnished by the plaintiff, and that in making said crossing the rail furnished should correspond to the rail used at that point by the defendant company, and the work should be done in a safe and workmanlike manner, and that the defendant company should furnish the necessary facilities for the same, as the statute requires. The court is further of the opinion that the crossing should be what is usually known as a "grade" crossing, with such facilities as are usual and necessary under like or ordinary circumstances, and without any interlocking plant, and that the $1,000 hereinbefore assessed as damages should be paid to the defendant company, or into the treasury of this court for the use of the defendant, as the plaintiff may elect, within 30 days next after the rendition of this judgment; and upon its failure to do so all of its rights herein adjudged should be forfeited, and the judgment in its favor held for naught. The court is further of the opinion that, under the circumstances of this case, each party should pay its own costs.